Good morning, Your Honors. Evan Marshall for the Appellant. I'd just like to address the two purported justifications offered by the Lumberman's Fund for this extraordinary third-party injury provision. First of all, they assert that they encounter some difficulty with enforcing lien or subrogation rights, and that may well be true. But a fund is always better off, like an insurer, is always better off with a subrogation or lien right, with a right of reimbursement, than without it. Because it's basically free money. You've got plaintiff's lawyer out there working for the fund. The ERISA funds are in an extraordinarily favorable position because they are able to avoid covering any part of the attorney's costs. They're able to get first-dollar reimbursement. They're able to avoid... Mr. Marshall? Yes. Mr. Marshall, why do we worry about whether they had a good reason for the exclusion? You worry about this because this is a provision which infringes upon certain rights and personal... Tell me what rights... Tell me what rights... It seems to me the wisdom or not wisdom of the provision is up to the fund. Unless it violates some law. So tell me what law it violates. It violates public policy in the sense that... What law? What statute? It's not a statute. It's... There's no statutory violation here, correct? There is... Well, no. ERISA doesn't require... ERISA does not require that they pay. The terms of the provision are not in violation of the statute. The application in terms of the notice and the opportunity to understand that you're acting in a manner... That's different. I asked what statute... Right. With respect to just the terms, the fund could have written a provision that said... There's no statute that requires them to do it. No. There is no statute that requires them to provide coverage for this, and they could have written a plan that says... Okay. So let's... I'm sorry. You've frozen on my screen. Now you're moving again. I'm sorry. Let me ask you a simple question. The union participated in the draftsmanship of this, the underlying agreement to establish the fund. I would assume that. I don't know... That's a joint employer-employee fund, correct? Yes, it is. Operated by the union. In fact, the trustees of the plan are both three union folks and three employer representatives, right? That's what it says in the plan. Okay. So you're not contending... Who makes the payments into the plan? Well... I'm an expert on ERISA. I've been reversed twice by the Supreme Court. And those decisions have really led to the economic problems we have today, where the court said that as long as the fund is actuarially sound, the employer who ran the fund could take billions of dollars out. You see what happened with the airline pilots and other people that put their own money into ERISA. Now, who contributes to this plan? Well, I assume that it's both, there are employee and there are employer contributions. I don't know. It's not really pertinent to my argument. I don't know. I like to look and find out what's really going on here. I mean, whose money is in there? The workers' money or the company's money? I assume there are contributions from both sides. That's the usual case. Sometimes it works that way and it will reach a certain point, it changes. Mr. Marshall, I'm not as big an expert on ERISA as Judge Pregerson, so you're going to need to help me with a couple of questions here. I think you've already said that this provision is not on its face violative of the statute, right? Nothing in ERISA prescribes the substantive terms of the plan in terms of what benefits have to be given. We're saying the same thing in different terms. And I know your brief argues that we should interpret this provision as only coming into play after a judgment is obtained in the third party action. Are you contending that the trustees unreasonably interpreted this provision? Because unlike normal insurance policy cases, we have to defer to the interpretation given to the provision by the trustees. Are you contending that they abused their discretion in interpreting it the way they did? I am. It is arbitrary and capricious in this case because they applied the manner not only in a surprising fashion in order to effect a default, but they applied it in a manner which defeats the purported objective. They said – Well, but let me separate the two. Is it unreasonable to interpret this clause as saying that you're excluded from benefits if you're seeking third party recovery? Is that an unreasonable interpretation on its face? Actually, that's pretty much what the fund contends it says. Provided you form the intention to pursue a claim against a third party, you have no coverage for those injuries. Okay. Now, let me move on to the question that I think Judge Payne said was a separate question. In this case, as I understand it, the fund set its first denial letter in September of 2008, and then it sent a number of denial letters up through the beginning of the next year, I think. And during that period, your client was represented by counsel. Yes. Did he ever say – did you ever say to the fund, either in the administrative proceedings or in the district court, I'm sorry, I didn't know the consequences of my decision, what we would really like to do is drop the lawsuit and just obtain these benefits? I take it your position throughout is you're entitled to both. Well, actually, the fund is sort of hoisted by its own petard. It could have had a reimbursement provision. That would have been an economically – No, I understand. That's not what I'm asking. I'm asking what your position has been. Your position hasn't been, oh, my gosh, my client made a mistake. Had he only known, he never would have sued. Your position is I'm entitled to sue and recover benefits, right? The fund's position has been that it's really irrelevant what happens. I'm asking about your position. I'm not asking about the fund's position. Today, today, are you just seeking the ability to drop your lawsuit and recover the $250,000? That lawsuit was, in fact, settled. Okay. So that lawsuit has gone away. It hasn't gone away in the sense that what you're seeking is the ability to recover money from a third party and have your benefits paid and have the benefits paid by the fund, right? How much was the lawsuit? Well, the lawsuit was settled for about $4 million, which was actually under compensation not only because it was a compromise, but because my client came in. There were a bunch of people killed and a bunch of family bystanders who witnessed this, so there were a whole bunch of claimants. All of those claims were settled prior to my client's claim. He settled for what was the balance of the remaining insurance, so it was actually undercompensated. So, I mean, when I first looked at this, I thought it was pretty unusual because, you know, because, I mean, this is sort of like an insurance policy. You get an insurance policy and you have medical coverage. You could use that. And then if you go to trial and you get a verdict or you settle a case, then there's a lien on that, and then they get paid off. And that's pretty much what… And so here, if this had been a normal situation, if he got money and he used a quarter of a million dollars, that was the coverage, wasn't it, on the medical? His medicals were somewhere between $350,000 and $400,000. But the coverage was limited to $250,000, was it not? $250,000. Well, he'd have to take the $250,000 and reimburse them. And that makes perfect sense. Your argument is that he was what's so burdened by all of these bills and that he settled for whatever he could get at the time he settled it. Is that your argument? No, I'm not. There was only a pot of money, and others were paid off, and all you had left was the $4 million. I think the settlement and the civil action is actually irrelevant to what I'm arguing. What I'm arguing here… No, but we like to deal in the real world. Okay. You know, I'd like to find out… Well, in the real world, here's what really happens in the real world. My client is in this helicopter crash. The engine fails on landing. He's in the hospital bed. He doesn't know whether he's got a claim against a third party or not because sometimes these engines fail because of a manufacturing maintenance defect, and sometimes a bird flies into it or some other debris goes in there. According to the interpretation of the fund, he's lying in his hospital bed, and when he decides, as most people would decide without knowing much more about tort liability, that he should go after somebody, he has forfeited his rights. Well, in your case, it sounds to me like he made a good choice. If he recovered $4 million in the settlement, then even under your theory of the case, he'd have to pay $250,000 back to the employer anyway, right? And if they had written a fair plan, I wouldn't have any problem with that. Okay, but I'm asking, I guess, what Judge Pregerson's asking. In the real world, how was your client injured by this plan? Well, in the real world… Since he recovered far more than the policy would have covered, and under your theory, he would have had to have paid that money back to the plan. In the real world, he was denied the ability to seek medical treatment from people who would not work on a lean basis, or people… he was denied the ability to go out and represent that he had this coverage from the fund that they would cover it. Did he get medical care? He did get medical care, right. He did. And he didn't get all the medical care he needed because his injuries were really catastrophic. Yeah, that's what I thought the record indicated, that he was able to get medical care in excess of the $250,000 that the policy would have covered. In fact, his medical bills, as you suggested, were $400,000 or so, right? Yes, $350,000 to $400,000. The problem here is that he was… really, that he was put to an election, an unknown election, between those rights. And the reason why… I started out with the question, it's not a statutory violation in terms of the substantive terms of the plan. The problem is that it does about four things wrong, or three or four things wrong, apart from the procedural unconscionability issue, because he doesn't know he's making a decision to forfeit benefits when he's lying in the hospital bed and decides he should sue some person as yet unidentified. The problem is that this plan… Well, he could say no at that time, couldn't he? He could have said no, I don't intend… He could say no. You know, maybe he would have said no. I don't have a pending lawsuit, and I don't know if I'm going to file a lawsuit. Well, maybe he probably felt like… He said no, and then two years later, after he's consulted with you, he says, ah, my wise counsel has advised me that I have a really good lawsuit, and now I'm suing. It sounds a little bit like insurance fraud, actually. What's wrong with that? The trouble is he didn't know that, because this letter, the firm doesn't bother to tell him. They send him this letter that says, do you intend to sue somebody? And that's the honest answer. Well, honestly, if somebody's in the hospital and they've just sustained a serious accident, they don't know whether they're going to sue, unless the lawyer's right there, you know, the capper's right there trying to, hey, you've got a lawsuit. No, all he knows at that point is the fund has sent him this letter demanding that he answer that question. I didn't think that letter came until after some of those bills had been… Because I remember reading an affidavit that the claims for reimbursement began to come into the fund. Yes. And one of the people who has paid the fund looked to them that there had been some sort of traumatic event, and that's what prompted the questionnaire to go out. Before they paid anything. That's right. Right. Questionnaire went out on September 5th, right? I agree with you. When I read that, I thought it was a pretty… I'm trying to choose my words. It wasn't a good thing, and it wasn't a fair thing to say, well, if you intend to sue someone, then this medical provision doesn't apply. I don't know. It's pretty harsh, because assuming he pays into the fund, the employer pays into the fund, he's got to pay his medical bills, they've got to lean on that recovery. So it seems a very, very harsh provision. I've never seen anything like it. But on the other hand, here you've got the union as part of it. So how did they let that happen? I have no idea how they let that happen, but in regards to what you were saying, I think the real problem with this and why it's so extraordinary, and we don't find this anywhere else in insurance or in any ERISA plan, because this is about risk allocation. And when he makes the decision to preserve your rights against a third party by not asking for benefits, you're assuming all the risk of loss, losing both benefits and not having a civil claim. This is about risk allocation. Normally the plan or the insurance company assumes that risk. You would say it's an unconscionable provision. I think I did say that. I didn't use that word. I'll turn my hearing aid up. Okay. It's in the brief. You're right. I haven't seen this kind of provision where an insurance company is the provider. And the difference seems to be that you're dealing with this jointly funded, apparently it's a cash fund that they have, and they're just trying to preserve as much benefits for all the members. But the way they preserve it, you know, a good way to- And the plan is shifting the risk. The way you would preserve it is by the conventional means of lien, subrogation rights, right of reimbursement, because that gets free money back to the fund. That gets the money back. Didn't the Supreme Court say you can't sue a beneficiary for paid benefits? You don't have to, because the one thing, the terrorized plaintiff's lawyers are liens out there from insurance companies and medical providers, and if they don't make sure they're paid, then the lawyer themselves gets liable for it. So it's very effective. Well, we can't account for what the Supreme Court does. Okay. Say that again. We can't account for what the Supreme Court does. No, I mean, what did you say? I agree with that, but- Reimbursement rights. Reimbursement rights, subrogation rights, very effective, because lawyers, plaintiffs' lawyers are very respectful of them, because if they don't observe them, they're liable to make themselves personally liable. So, and this is why you don't find this provision in any other plan, and why a risk- Would that be true here, Mr. Marshall? Excuse me? As I understand, when the plan was amended in 2002, all the subrogation provisions were taken out of it, were they not? They took it out, and the only real explanation- Right, so- The only real explanation for taking that out- I'm sorry. Is because they thought that through this scheme, people were basically going to be forfeiting the right to benefits in cases where there was some third-party involvement. They were able- No, I'm asking a different question. In your case, do you agree that the fund could not seek subrogation because there is no provision now in the contract? They were hoisted by their own petard. I've heard about the petard twice now. I think this is a yes or no question. Do you agree that in your case- I'm not sure. If they go outside ERISA, if you go outside the terms of the plan, whether they're able to enforce some kind of common law subrogation- They would have an equitable claim, and I think the Supreme Court still recognizes the right to pursue an equitable claim. Irrespective of the policy of the terms of the plan. Well, I guess there's your answer. Well, well. Thank you. Thank you. It's a very interesting case. We've got to hear from the other side. The insurance company. I mean the plan. Good morning, Your Honors. Tom Brady for the Appalese, the Southern California Lumber Industry Welfare Fund and its Board of Trustees. This is an interesting case, but there are, I think, a couple things going on here. We heard a lot of hypotheticals about the hypothetical harm that could come to certain participants in the plan based on this provision. But the evidence in the record doesn't show that this particular participant experienced any harm. It appears that he got clearly, although the medical treatment- He certainly had the risk of harm. There's some risk if ultimately he didn't recover in his personal injury action, but we found out today for the first time that he did recover $4 million, which is well over and above the amount of medical expenses the plan would have paid, which were capped around $250,000. Mr. Brady, can I ask you a question about the charts? I don't know much about them, but I'll- Yeah, but it's a particular one. Is it the trustees in the plan's position that Mr. Necker- I assume that's how you say his name. I think it's Necker. Mr. Necker irrevocably forfeited any right to benefits when he filled out that questionnaire? Right. Once he decided that he was- No, I'm not- Don't rephrase my question for me. My question is, once he filled out that questionnaire, did he have the ability after that to say, oh my gosh, I didn't realize what the consequences of this are, we won't bring the lawsuit? Or is it your position, as your opponent said, that once he filled out that questionnaire in his handwriting, his right to medical benefits was completely gone? Right. Once he filled out that form, the claims were denied. The claims weren't denied until he filled out that form. Okay. And nothing he did thereafter could have saved him? No, the claims were denied at that point based on his representation on the form. Now, that's not what I'm asking. I'm asking whether or not if he came back the next week, he then consulted with counsel and said, you know, I was lying in a hospital bed and I filled out this form. And, you know, I'm wondering now whether it's a problem. And counsel said, yeah, you really ought to drop your lawsuit if you want medical benefits. I want to know whether or not that single action by him at the time made him thereafter ineligible for medical benefits under the policy no matter what he did. Well, based on the hypothetical you just gave, he signs the form, but then at some later point he talks to his attorney and they say, well, we're going to withdraw the lawsuit or we're not going to file the lawsuit. The claims would have been denied based on his signing the form, but he could have filed an appeal with the Board of Trustees, said, you know what, even though I signed the form and the claims were denied, I've decided that I'm no longer going to pursue the lawsuit. And the trustees can make a decision on whether or not they would pay the claims. Again, the hypothetical, it hasn't happened, but I'm thinking that's a possibility. He could have filled this work. And if he denied the claims, in that instance he could file a lawsuit and allege that the denial of benefits under those circumstances was unreasonable. Absolutely. Correct? That's correct. And I understand that's not this suit, but I was trying to figure out when the critical point occurred here. The claims were denied rather quickly, but then there was an appeal to the Board. That's correct, yes. And there was no point during the appeal to the Board where Mr. Noker said, I didn't realize the consequences of my election. I would rather have benefits than a lawsuit. No, he didn't. He had counsel, and as is usual in these cases, the attorneys representing these people who are involved in accidents caused by third parties, they're pretty good at looking at how the plan is going to pay $250,000 in medical benefits. They're pretty good at determining whether or not they're going to be able to recover in excess of that to pay the medical expenses, to pay their attorney's fees, and get other damages for their client. And in this case, it appears that everything worked out perfectly and that they did recover well in excess of the $250,000 limit. And there are times when the lawyer finances the entire lawsuit. I'm sure that happens all the time in personal injury cases. So I think what we're saying here, the facts before the court and the evidence. Not all the time. Some of the time. But in this specific case, with the facts and the record, it just, again, doesn't appear that the provision caused the participant any harm because he did get medical care. He did pursue a third party. The provision didn't prevent him from filing the lawsuit. He went ahead and did it based on his consultation. That may have been the practical result, but that's not the whole. He's not going to win or lose on that basis, the fact that he didn't suffer any harm. He claims that the way in which the board interpreted this plan, provision, was unreasonable. He offered an argument that cause should have been interpreted after there had been a judicial determination of cause. So why is that argument not persuasive? There's just no textual support for that argument, and it's also just illogical. It doesn't make any sense because there are two clauses in that exclusion. The exclusion states that no benefits are payable for services rendered or expenses incurred for injuries or illnesses that are caused by a third party, and then the second clause is where you are pursuing or intend to pursue a lawsuit. So first of all, there's no language that says actual legal causation is required, and secondly, the second clause wouldn't make any sense. If you had to have legal causation, how do you square that with the fact that you have to be pursuing or you intend to pursue a lawsuit? Things would be sort of backwards there. Legal causation can't be determined while you're pursuing a lawsuit or you intend to pursue a lawsuit. I just don't understand that argument. Well, a legal causation would require a court or some other tribunal or an admission by the person who caused the harm that they, in fact, did cause the harm. And at an early point in the case, when benefits need to be paid, there's no possible way in most circumstances that there's going to be a legal causation determination made early on in the case. So I just don't see how the provision could reasonably require legal causation. And, in fact, basically the only way that that provision could work to require legal causation is to say, okay, well, until there's a determination of legal causation, we're going to go ahead and advance the benefits. We're going to pay the benefits and then try to recover them once a legal causation. Well, you know, I've never seen a provision like this one in an ERISA plan. And I just wonder why was it inserted in this one? Well, the reason the trustees inserted it was because back in 2002 with the Great West case, it became difficult for the fund to recover once they advanced benefits. And we were having so much difficulty keeping track of all these lawsuits and figuring out, you know, if judgments were entered, if settlements, you know, were made and trying to recover that money. Then we have the attorneys fighting us on the other end for these members saying, well, we're not going to reimburse you the full amount. We're only going to reimburse you part of the amount minus our attorney's fees. And this is still going on today. There was just a recent Supreme Court oral argument a couple of days ago, not a couple of days, a couple of weeks ago in the McCutcheon case, where it's the exact same thing is going on, where people, plaintiffs, attorneys are still fighting reimbursing funds based on these reimbursement provisions, even when there are clear language in the plan that says the plan gets 100% reimbursement. So this has been going on since 2002. It's continuing on to today. And the trustees just made a determination that the best way to solve this is to put this provision in the plan. Well, I mean, all insurance companies are faced with subrogation rights. And so you're telling me that if there's a provision in an insurance policy that gives the insurer a lien on any recovery in the case involving personal injuries, that insurance companies are collecting that? Well, I think, first of all, I just want to make clear that this particular fund is not an insurance company. Well, that's insane. It's like an insurance company. But, yeah, I think what I'm representing to the Court, and it's clear in the McCutcheon case before the Supreme Court, and also the CGI case that was recently decided in the Ninth Circuit, is that even though these plans put clear provisions in them that say we'll advance the benefits, but we're entitled to 100 percent reimbursement, what I'm telling you is that there are still plaintiff's attorneys that are arguing, it doesn't matter what you put in the plan. The Court can rewrite the plan, take these provisions out, and allow the participant to repay money less than the full amount of the medical benefits in order to cover attorney's fees or in situations where they're not made whole in their damages, they don't have to pay everything back. What I'm saying is that goes on all the time, and it's still going on as we stand here today. What happens under your plan if the worker says on day one, I intend to pursue somebody? No, I don't intend to pursue somebody. I'm sorry. You then advance medical expenses up to the plan limit, and two years later, as Judge Paz suggested before, he files a lawsuit and recovers a bunch of money. Are you entitled to any of it? Well, I think what we would do in a case like that is essentially, yeah, we'd try to pursue the recovery. Under what theory? You took all the subrogation. Right. You had a bunch of subrogation provision plan, and you took them out. Isn't that a pretty clear statement to the workers that you're not going to chase them? Well, there are a few options available to the plan. We could say, well, since we paid those benefits to you, and we probably shouldn't have, under the terms of the plan, well, we're going to offset future claims. So we won't pay future claims until that amount is essentially repaid to the plan. That may be one avenue that we would have. Wouldn't you have an equitable claim? Well, that's an interesting question. I thought that's all that was left. Well, you could bring an equitable claim under ERISA 50283. Right. Okay? But you would try to enforce the terms of the plan. But in our case, there's really no provision in the plan that would allow us to go back and recover. So, yeah, we would be in a bad spot there. You're relying on the participants, of course, being honest. And if they are pursuing a lawsuit, then not lying about that. But that's not to say we wouldn't find out about it if they, in fact, were pursuing the lawsuit. It's a small world out there. Well, you can tell, like in this instance, they could tell from the claims that were coming in that there had been some traumatic event. Right. Absolutely, yeah. The claims process will flag those claims when they're high-volume claims and they look like they're a result of personal injury. How long after the accident in this case was the September 5th letter sent? I know the record reflects it, but I'm not sure I know that. Let's see. I believe it wasn't sent out until sometime in September, because that's when the fund first started receiving the claims. I don't have the exact date, but it would be sometime probably between September 1st and September 4th. No, you misunderstood my question. The letter was sent on September 5th, I think the record reflects. At least it's dated September 5th. How long after the accident that caused the injuries to Mr. Noca? I believe the accident was in May of 2008. And does the record reflect whether he was represented by counsel at the time he got this letter? I know it reflects that he was represented by December 11th, because that's when the notice of appeal was filed. Yes, I believe he was represented when he filled out the form. I don't want to misrepresent, but that was our understanding of the facts, and I think we did put that in our brief. I don't have anything specific where we know for sure, but that's always been our understanding that he was represented. Yes, I did, but I couldn't find it in the record. That's what I was asking. Right. So are there any other questions I can answer for you? Okay. Thank you. All right. Maybe you have the answers to these last questions. I believe that Mr. Noca was, in fact, represented by counsel in regard to the helicopter accident. I wasn't advising him with regard to the benefits issue, because we didn't know there was a benefits issue at that time. But there's nothing in the record either way on that, I take it? No, no, there isn't. Okay. Am I out of time, Your Honors? Well, you did not represent him in the other matter. We represented him in regard to the helicopter crash. Yeah. Yes. Well, you represented him. Yes. Do you want to say something else? I'd just like to say this. With regard to the legal causation issue, the trouble here is that if you take out legal causation, then this provision doesn't serve the purported objective of shifting. They say we did this. We have these provisions because it's allowed to shift liability to the third-party tort fees. There is no third-party tort fees. If it's irrelevant whether there's legal causation, then it doesn't serve that purpose. The claimant is just out-of-pocket expenses. He's lost. He has no third-party claim, and he has no benefits. Mr. Marshall, can I ask you one more question? I'm sorry to keep you standing up past the time limit. You can stay here as long as you want. What are you seeking in this case? We're seeking, in part, a declaration that this is not enforceable. Okay. So if it's not enforceable, they have to pay your client's hospital bills up to $250,000? Yes. Haven't they already been paid? They have, but this is a benefit. It's like the collateral source rule. He paid into this. He bought it. He earned this. I guess I'm going back in a circle to the question I asked Mr. Brady. If they're entitled to get it back, which was the premise of your sort of opening argument, then why are we here? Well, I don't know whether they're entitled to get it back or not. So I think both parties have been proceeding on the basis that they would not be able to get it back. I think that's been the assumption so far by both sides. I thought the way you were arguing the plan should be read is that they should advance them and then have the ability to get them back had they advanced them. Well, no, my position was that that's what ERISA funds do, and that's a rational thing to do. And what they did was irrational. And I don't take the position that they are entitled to act as if they had preserved subrogation, lien, or reimbursement rights. They're just not entitled to cause a forfeiture of benefits based on the fact that this guy decided that he wanted to exercise his rights to get general damages and other economic damages. Thank you. Had he consulted with an attorney before, to your knowledge, checking that price? No. No, he had not. We did not know anything about this. We didn't represent him, advise him. He had no legal counsel. Does the record reflect that, or you're from your own personal knowledge? The record does not reflect that. Okay. Okay, thank you. Well, okay, thank you.
judges: Pregerson, Paez, Hurwitz